UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Maddog Software, Inc.

    v.                           Civil No. 04-cv-483-JD
                                 Opinion No. 2005 DNH 117

Michael A. Sklader

O R D E R

Maddog Software, Inc., has moved for a preliminary injunction against its former employee, Michael A. Sklader, to prevent him from distributing certain software for use in the intermodal trucking industry.[1]  Maddog alleges that Sklader's software, known as "IMX," infringes on Maddog's copyright in a program known as "FastFreight" and, furthermore, that his distribution of it violates the terms of a non-competition agreement between the parties.  Sklader, proceeding pro se, objects to the motion.  The court held an evidentiary hearing on Maddog's motion on June 1, 2005.

Background

The court makes the following preliminary findings of fact based on the testimony and exhibits received at the hearing.

---

[1]This industry employs a variety of different means of transportation to move freight.

Fed. R. Civ. P. 52(a); TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544 (1st Cir. 1996).  Maddog is owned entirely by Jim McKenna, the president of Manchester Motor Freight ("MMF"), an intermodal trucking company.  In early 1994, Maddog hired Sklader to design a computer program to assist MMF with its dispatch and billing functions.  Maddog also hoped to sell the program to other intermodal truckers.  Later that year, the parties entered into a written employment agreement, which provided in relevant part that "upon termination of [Sklader's] employment for any reason, he will not directly engage in the same line of business, now carried on by Maddog Software, for a period of three years and within the territory of New England, New York, New Jersey, and Pennsylvania."  Ex. 1, ¶ 2.

By early 1996, Sklader had finished designing the program, dubbed "FastFreight."  He then assigned all of his interest in the program to Maddog through an "Assignment of Copyright" agreement, so named despite the fact that no copyright on the program had been registered at that point.  The agreement describes FastFreight as "a motor freight intermodal transportation tracking and dispatch system, written in Microsoft Access," a popular database program distributed by Microsoft.  Ex. 2, at 3.  FastFreight also incorporates a number of other Windows-based applications distributed by third parties,

2

including FaxWorks Pro Lan, PaperBridge, and ProComm Plus. Although the evidence remains sketchy on this point, FastFreight appears to function as a specialized database which ferries information on an intermodal trucking company's shipments among the various "departments" which need the data, e.g., scheduling, dispatch, accounts receivable, and the like.  To that end, like most databases, FastFreight permits the entry of such data on a number of different forms, which have themselves been designed to accommodate the standard practices of the industry.  Maddog ultimately sold about a dozen copies of FastFreight to various intermodal trucking companies across the country, none of which was located in any of the New England states or New York.

Eventually, the third party applications that interfaced with FastFreight started to become obsolete, creating difficulties for Maddog customers who wished to continue using the program.  These difficulties became more acute with Microsoft's release of Windows XP, which superseded the Windows 98 version of the ubiquitous operating system on which FastFreight had been designed to run.  According to McKenna, after Sklader failed to address these problems in an expeditious fashion, Maddog terminated him effective April 30, 2002.  Sklader recalls, however, that his termination came about because he had by that point fully automated MMF's operations through

3

FastFreight and McKenna no longer wished to pursue sales of the program to other intermodal truckers.

The terms of the separation are likewise a matter of some dispute. McKenna acknowledges telling Sklader that, notwithstanding the non-competition provision of his employment agreement, he was free to "service the existing customers" of Maddog. McKenna denies, however, saying that he was leaving the software business or otherwise authorizing Sklader to sell competing software to Maddog's customers. In fact, before Sklader left Maddog, he met with the employees of a software development company that McKenna had hired to design a new version of FastFreight. Although that company has since been replaced, Maddog continues to redevelop FastFreight, and plans to market it as soon as the new version is saleable.

Sklader testified that, prior to his separation from Maddog, McKenna indicated he wanted out of the software business and encouraged Sklader to "[t]ake the software, take the customers, just take it." In fact, McKenna acknowledges personally directing certain Maddog customers to Sklader for support with their FastFreight systems following his termination. By and large, these customers had sought help from Maddog for difficulties with FastFreight arising from the obsolescence of the Windows 98 operating system and its accompanying 16-bit

4

format.  Based on his observation that McKenna did not intend to

honor Maddog's commitments to provide ongoing support to its

FastFreight customers, Sklader took McKenna's words to heart,

making his services available to several of Maddog's customers.

Sklader maintains that the services he actually provided

amounted to little more than upgrades of FastFreight, tailored to

the needs of each particular customer.  His work included, for

example, aiding in the conversion of FastFreight forms created

with an older version of Microsoft Access into a format

compatible with a contemporary version of that program.

Nevertheless, Sklader peddled his services as a distinct software

package bearing the name "IMX."  On October 31, 2002, Sklader

received $3,500 from a Maddog customer in New Jersey for the

installation of "IMX Software."  Ex. 4.  Sklader also sold IMX,

together with related installation, training, and conversion

services, to another Maddog customer, Hammer Express in Illinois,

in early 2003.[2]  In obtaining this sale, Sklader described IMX as

a new program, rather than as an upgrade.

At the hearing, Sklader explained that while he does not

_____

[2]Maddog also submitted a form mistakenly sent to MMF which,
given its similarity to a form included with FastFreight,
suggests that another Maddog customer in New Jersey has also
purchased IMX.  Maddog was unable to present a witness with
personal knowledge of whether this New Jersey company had
actually installed IMX, however.

consider IMX to constitute software, he marketed it as such in order to distinguish his services from anything to do with hardware, which he installed as part of the work he performed for Maddog but no longer offers.  He also suggested that he used the term "software" in marketing materials in an attempt to describe his services in a way familiar to laypeople, although the term "upgrade" appeared to serve that purpose just as well at the injunction hearing.  In any event, McKenna takes the position that nobody, not even Maddog's customers, can modify the FastFreight forms or tables, because "the forms and tables are part of FastFreight, which is [a] copyrighted product."

Sklader testified that he created the bulk of FastFreight simply by using the familiar "Wizard" function in Microsoft Access.  As he demonstrated at the hearing, albeit with the version of Access now in circulation instead of the less advanced predecessor available at the genesis of FastFreight, the Wizard assists in designing forms by allowing the user to choose from a menu of options as to which fields and buttons to include. Access then generates source code, i.e., a series of instructions to a computer rendered in a language comprehensible to humans, corresponding to that form.  Sklader also testified that he copied most of the FastFreight forms from a sample database distributed with Access.  He acknowledged, however, that creating

FastFreight required him to write his own code at least on occasion.  Nevertheless, rather than creating this code from whole cloth, Sklader recounted that he arrived at much of it "from samples and bits and pieces" of sample code publicly available within the programming community.  He also explained that many of the FastFreight forms embody mathematical formulae, such as that used to calculate the charge for a certain kind of freight transport, that cannot be expressed any way other than how they are in the code underlying the forms in question.

Stanley M. Metcalf, an experienced software engineer, examined FastFreight while developing the updated version of the program for MMF.  He explained that while Microsoft Access provides "a programming language so that people can write their own customized functions and programs within Access," he considers this simply a tool that a programmer can use to create software.  In writing a large and complex program, according to Metcalf, a programmer would inevitably encounter problems that could be solved only by actually writing code, as opposed to using Microsoft Access to generate it.

Metcalf confirmed that a newer version of Microsoft Access could aid in the conversion of files created with an older version of the program, as Sklader claims to have done in upgrading FastFreight with IMX.  Nevertheless, the Access

7

conversion function would not complete the task successfully on its own, requiring some programming expertise to finish the job. This course, rather than writing a new program from scratch, is the appropriate way to service a customer whose Microsoft Access forms have become outdated, according to Metcalf.

Metcalf has also examined IMX in the course of developing the updated version of FastFreight for Maddog.  Although he could not access much of the actual IMX source code due to the program's password protection, he testified that a "huge percentage" of the program is "identical" to FastFreight. Specifically, Metcalf related that IMX contains a series of queries, or means of accessing a database, which appear to have been copied wholesale from FastFreight, resulting in forms which look identical to FastFreight's.  Metcalf also concluded that IMX contains macros, modules, and reports which are identical to FastFreight's, though he did not explain the significance of any of these elements to the operation of either program.[3]  Metcalf opined that Sklader could have made choices in writing IMX which would have made it fundamentally different from FastFreight, but the only such choice he identified in that regard was for Sklader to have written the program outside of Microsoft Access.  While

---

[3]Sklader suggested that a FastFreight report conveys the information submitted on a form.

8

Sklader did not deny copying elements of FastFreight in developing IMX, he explained that each installation required him to modify some of those elements to suit the client's needs.

Maddog became aware of Sklader's distribution of IMX sometime in late 2003.  On December 15, 2004, Maddog filed its application for a registered copyright in FastFreight.  The registration became effective on December 20, 2004, the same day Maddog commenced this action against Sklader.

Standard of Review

In deciding a motion for a preliminary injunction, the court makes a familiar four-part inquiry, examining (1) the plaintiff's likelihood of success on the merits of its claims, (2) the potential for irreparable harm to the plaintiff if the motion is denied, (3) whether any such harm outweighs the harm that granting the motion would cause the defendant, and (4) any effect the ruling would have on the public interest.  E.g., Charlesbank Equity Fund II, Ltd. P'ship v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004); Matos ex rel. Matos v. Clinton Sch. Dist., 367 F.3d 68, 73 (1st Cir. 2004).  In copyright cases, however,

> Several general rules regarding application of the four
> factors . . . have evolved.  First, . . . irreparable
> harm is usually presumed if the likelihood of success
> on the copyright claim has been shown . . . .
> Secondly, the issue of public policy rarely is a

> genuine issue if the copyright owner has established a
> likelihood of success [because] it is virtually
> axiomatic that the public interest can only be
> served by upholding copyright protections and,
> correspondingly, preventing the misappropriation of the
> skills, creative energies, and resources which are
> invested in the protected work.

Concrete Mach. Co. v. Classic Lawn Ornaments, Inc., 843 F.2d 600,

611-12 (1st Cir. 1988) (internal citations and quotation marks

omitted); see also Media Touch Sys., Inc v. Ranson Audio, Ltd.,

1994 WL 258616, at *5-*6 (D.N.H. Mar. 31, 1994).  In balancing

the harms under the traditional test, "[w]here the only hardship

that the defendant will suffer is lost profits from an activity

which has been shown likely to be infringing, such an argument in

defense merits little equitable consideration."  Concrete Mach.

Co., 843 F.2d at 612 (internal quotation marks omitted).


                              Discussion

I.   Maddog's Copyright Claim

     To succeed on a claim of copyright infringement, a plaintiff

must prove (1) ownership of a valid copyright in a work, and

(2) the defendant's copying of constituent elements of that work

which are original.  Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,

499 U.S. 340, 361 (1991); see also, e.g., Segrets, Inc. v.

Gillman Knitwear Co., 207 F.3d 56, 60 (1st Cir. 2000); Saenger

Org. v. Nationwide Ins. Licensing Assocs., 119 F.3d 55, 59 (1st

                                 10

Cir. 1997).  Sklader contends that Maddog has failed to
demonstrate a likelihood of success in proving either of these
elements.  Specifically, he argues that FastFreight's copyright
registration is invalid because the program lacks the requisite
level of creativity as a whole to qualify as an original work
subject to copyright protection.  See Feist, 499 U.S. at 345-47.
He also argues that the evidence adduced at the hearing fails to
show that he copied the original components of FastFreight, if in
fact there are any.  See id. at 348.  Finally, Sklader contends
that, even if he did copy protected elements of FastFreight, he
did so only in making it compatible with current versions of
Microsoft Windows and Access on behalf of those who had purchased
FastFreight from Maddog and is therefore not liable for
infringement by virtue of 17 U.S.C. § 117(a)(1).[4]

     A.   Validity of the FastFreight Copyright Registration

     Under 17 U.S.C. § 410(c), "the certificate of a registration
made before or within five years after first publication of the

_____

     [4]In relevant part, this statute provides that "it is not an
infringement for the owner of a copy of a computer program to
make or authorize the making of . . . [an] adaptation of that
computer program provided . . . that such . . . adaptation is
created as an essential step in the utilization of the computer
program in conjunction with a machine and that it is used in no
other manner."

work shall constitute prima facie evidence of the validity of the copyright . . . ."  As Maddog acknowledges, it cannot avail itself of this provision here, because FastFreight appeared in 1996 but was not registered with the copyright office until December 20, 2004.  Mem. Supp. Mot. Prelim. Inj. at 10.  Section 410(c) therefore invests this court with the discretion to accord the appropriate evidentiary weight to the registration.  Sem-Torq, Inc. v. K Mart Corp., 936 F.2d 851, 853-54 (6th Cir. 1991).

"To show ownership of a valid copyright and thus satisfy the first prong under Feist, a plaintiff must prove that the work as a whole is original and that the plaintiff complied with applicable statutory formalities."[5]  CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1513 (1st Cir. 1996).  Maddog argues that Sklader exercised the requisite degree of creativity in developing FastFreight by "select[ing] from and arrang[ing] sections of source code generated through Wizards on Microsoft Access."  Mem. Supp. Mot. Prelim. Inj. at 8.  In support, Maddog relies on Feist's holding that a work "that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an

_____

[5]Although Sklader questions Maddog's compliance with applicable statutory formalities in registering FastFreight, Mem. Law Obj. Mot. Prelim. Inj. at 5-7, the court need not decide that issue at this point for reasons which will appear.

original selection or arrangement."  499 U.S. at 348.

The plaintiff in <u>Feist</u>, a regional telephone company,
claimed infringement of its copyright in an alphabetized listing
of its subscribers' names, phone numbers, and towns published in
the form of a telephone directory.  <u>Id.</u> at 342-44.  The court
held that such a collection of facts, generally known as a
"compilation," could be copyrightable, but only if the facts were
"selected, coordinated, or arranged 'in such a way' as to render
the work as a whole original."  <u>Id.</u> at 358 (quoting 17 U.S.C. §
101 (defining "compilation" for copyright purposes)).  The court
emphasized, however, that copyrightability demands little in the
way of originality, explaining that

> novelty is not required.  Originality requires only
> that the author make the selection or arrangement
> independently (<u>i.e.</u>, without copying that selection or
> arrangement from another work) and that it display some
> minimal level of creativity.  Presumably, the vast
> majority of compilations will pass this test, but not
> all will.  There remains a narrow category of works in
> which the creative spark is utterly lacking or so
> trivial as to be virtually nonexistent.

<u>Id.</u> at 358-59.  Nevertheless, the Court concluded that the
plaintiff's telephone listings did not qualify for copyright
protection, reasoning that neither arranging the listings
alphabetically by last name nor selecting phone numbers and towns
as additional information to include in the directory embodied
the necessary modicum of creativity.  <u>Id.</u> at 362-63.

13

In the court's view, FastFreight embodies significantly more creativity than the telephone directory at issue in <u>Feist</u>.  Using the Microsoft Access Wizard to generate FastFreight required Sklader to make a number of choices as to what buttons and fields to include.  Similarly, although Sklader explained that he lifted most of FastFreight's forms from a database distributed with Access, he had to choose those forms from the database according to how they suited the practices of the intermodal trucking industry.  Sklader also had to choose sections of source code from what was available in the public domain on those occasions when the Wizard failed him in developing FastFreight.  Furthermore, after selecting the appropriate elements of FastFreight in this manner, Sklader had to arrange them so that they would work in conjunction to allow the program to operate.  Unlike the plaintiff's selection of the information about each subscriber to publish in the directory in <u>Feist</u>, and the alphabetical arrangement of that data, Sklader's choices in assembling FastFreight transcended the obvious and imbued the program with at least the minimal degree of creativity necessary for copyright protection of the work as a whole.[6]  <u>See</u> <u>Assessment</u>

---

[6]In <u>Lotus Dev. Corp. v. Borland Int'l, Inc.</u>, 49 F.3d 807 (1st Cir. 1995), <u>aff'd by an equally divided court</u>, 516 U.S. 233 (1996), discussed <u>infra</u>, the First Circuit determined that the district court erred by treating the fact that the defendant

<u>Techs. of WI, LLC v. WIREdata, Inc.</u>, 350 F.3d 640, 642–43 (7th Cir. 2003) (ruling that database program that organized tax assessment data into various searchable tables was copyrightable as a whole).  Given the "extremely low" quantum of creativity necessary for a work as a whole to receive copyright protection, the court agrees with Maddog that it has demonstrated a likelihood of success in proving the first <u>Feist</u> element.

     B.   <u>Whether Sklader Copied Original Elements of FastFreight</u>

     The court's assessment of Maddog's copyright claim does not end with the determination that FastFreight as a whole is copyrightable, even though Sklader has admitted copying elements of the program in creating IMX.  Indeed, "it is important to note that copying does not invariably constitute copyright infringement."  <u>Johnson v. Gordon</u>, 409 F.3d 12, 17–18 (1st Cir. 2005).  Instead, as the Supreme Court has explained,

---

could have arranged the allegedly infringing hierarchy of menu commands for its spreadsheet program differently from the plaintiff's as evidence of copyrightability.  <u>Id.</u> at 816. There, however, the defendant had conceded the validity of the plaintiff's copyright in its program as a whole.  <u>Id.</u> at 813. Because that issue was therefore not before the circuit in <u>Lotus</u>, the court does not read the case as precluding reliance on the creativity incident to the arrangement of noncopyrightable elements into a composite work in finding the work copyrightable <u>as a whole</u>.  <u>Id.</u> at 818 ("we do not understand ourselves to go against the Supreme Court's holding in <u>Feist</u>").

> [t]he mere fact that a work is copyrighted does not
> mean that every element of the work may be protected.
> Originality remains the sine qua non of copyright
> protection; accordingly, copyright protection may
> extend only to those components of a work that are
> original to the author.

Feist, 499 U.S. at 348; see also Tufenkian Import/Export

Ventures, Inc. v. Einstein Moomjy, Inc., 338 F.3d 127, 132 & n. 4

(2d Cir. 2003) ("While necessary to copyright protection,

however, originality is not a sufficient condition for such

protectibility"); 4 Melville B. Nimmer & David Nimmer, Nimmer on

Copyright § 13.03[B][2][c], at 13-76 (2003) ("even admitted

literal copying is not actionable when limited to unoriginal

expression") (footnote omitted).  Thus, to satisfy Feist's second

element, a plaintiff must prove the defendant's "copying of

constituent elements of the work that are original."  499 U.S. at

361 (emphasis added).

     Proving this element, in turn, requires a showing that

(1) the defendant copied the plaintiff's work as a factual matter

and (2) "the copying of copyrighted material was so extensive

that it rendered the offending and copyrighted works

substantially similar."  Lotus, 49 F.3d at 813; see also, e.g.,

Segrets, 207 F.3d at 60.  The plaintiff may prove the first of

these elements, often referred to as "factual copying," through

either direct or circumstantial evidence.  E.g., Johnson, 409

F.3d at 18.  Circumstantial evidence of factual copying consists
of proof that "the alleged infringer had access to the
copyrighted work and that the offending and copyrighted works are
so similar that the court may infer that there was factual
copying (i.e., probative similarity)."  Lotus, 49 F.3d at 813;
see also CMM, 97 F.3d at 1513.  Assessing the "probative
similarity" of two works for this purpose presents an inquiry
which differs slightly from the assessment of "substantial
similarity" that comprises the second element of actionable
copying.  Johnson, 409 F.3d at 18.  Nevertheless, "[t]he
requirement of originality cuts across both of these similarity
criteria.  The resemblances relied upon . . . must refer to
'constituent elements of the [copyrighted] work that are
original.'" Id., at 18-19 (quoting Feist, 499 U.S. at 361).

     To determine whether elements of a computer program qualify
for copyright protection and could therefore subject a defendant
to liability for copying them, most courts have endorsed a form
of the "abstraction-filtration-comparison test" popularized by
Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 703
(2d Cir. 1992) ("Altai").  See 4 Nimmer, supra, § 13.03[F], at
13-106--13-108.  In brief, this approach requires a court to
        first break down the allegedly infringed program into
        its constituent structural parts.  Then, by examining
        each of these parts for things such as incorporated

>ideas, expression that is necessarily incidental to
>those ideas, and elements that are taken from the
>public domain, a court would then be able to sift out
>all non-protectable material.  Left with a kernel, or
>possible kernel, of creative expression after following
>this process of elimination, the court's last step
>would be to compare this material with the structure of
>an allegedly infringing program.

Altai, 982 F.2d at 706.  The Altai test therefore provides a structured approach to analyzing computer programs under traditional doctrines of copyright law developed to differentiate unprotectable ideas from protectable expression, as well as protectable forms of expression from unprotectable forms.  Id. at 707-710; 4 Nimmer, supra, §§ 13.03[F][1]--[F][4].

Specifically, Altai's "filtration" step applies the doctrines of merger and scènes à faire to differentiate the copyrightable elements of a program, if any, from its noncopyrightable ones.  982 F.2d at 707-710.  The doctrine of merger, a necessary corollary to the noncopyrightability of ideas, holds that "[w]hen there is essentially only one way to express an idea, the idea and its expression are inseparable and copyright is no bar to copying that expression."  Concrete Mach., 843 F.2d at 606.  The related doctrine of scènes à faire denies copyright protection to "unoriginal elements flowing from the undisputed standard and inherent characteristics" of a common

idea.[7]  CMM, 97 F.3d at 1522 & n.25.  Altai's filtration step
also ensures that material found in the public domain, which
copyright law makes "free for the taking," does not become
eligible for copyright protection merely by virtue of its
incorporation into a computer program.  982 F.2d at 710.

Despite Altai's widespread acceptance, the First Circuit
refused to apply it in the case of a defendant's admitted factual
copying of an element of the plaintiff's computer program.
Lotus, 49 F.3d at 815.  In light of this admission, the circuit
noted that Lotus assumed "a very different posture from most
copyright infringement cases, for copyright-infringement
generally turns on whether the defendant has copied protected
expression as a factual matter."  Id. at 813.  Unlike Lotus, and
like most copyright cases, this case turns on factual copying:
although Sklader admits to copying certain elements of
FastFreight, he denies that those elements constitute protected
expression.  Lotus does not foreclose the court's use of Altai's
abstraction-filtration-comparison test here to determine whether
Sklader did indeed engage in factual copying of FastFreight.

In any event, both parties agree that Altai provides the

---

[7]"For example, the choice of writing about vampires leads to
treating killings, macabre settings, and choices between good and
evil."  4 Nimmer, supra, § 13.03[B][4], at 13-78.7.

appropriate standard in that regard.  Mem. Supp. Mot. Prelim.
Inj. at 11; Mem. Law Obj. Mot. Prelim. Inj. at 12-13.  The court
will therefore apply the Altai test in determining whether IMX
incorporates constituent original elements of FastFreight so as
to constitute actionable copying.  Cf. ILOG, Inc. v. Bell Logic,
LLC, 181 F. Supp. 2d 3, 8 (D. Mass. 2002) (evaluating
infringement claim arising out of alleged software copying under
both Lotus and Altai where plaintiff did not specify which test
should be used).

        As the first step in the Altai analysis, the court must
"dissect the allegedly copied program's structure and isolate
each level of abstraction contained within it."  982 F.2d at 707.
At the lowest level of abstraction, a program consists of the
code itself.  Id.  The code is organized into modules, or sets of
instructions to be carried out in performing a specific task.
Id.  These specific tasks are themselves organized according to
the more general tasks they serve, which are in turn similarly
organized into sets of yet more general tasks and so on and so
forth until reaching the ultimate function of the program itself.
Id.  This ultimate function also represents the program's highest
level of abstraction.  Id.  After identifying the structural
components at each level of abstraction, the court uses the
filtration analysis to determine whether their inclusion at that

level embodies protectable expression.  Id. at 707.

Despite Maddog's insistence on Altai as the source of the
appropriate test for analyzing its infringement claim, neither
Maddog's presentation at the injunction hearing nor its
subsequent brief provides any assistance in abstracting
FastFreight.  Instead, Maddog simply asserts that the program's
"core of protectible expression" consists of "the design,
selection and arrangement of the screens, directories, macros and
other data."  Mem. Supp. Mot. Prelim. Inj. at 11.  This "design,
selection and arrangement" presumably serves FastFreight's
ultimate function, which Maddog identifies as "maximizing the
efficiency of a trucking company."  Id. at 9.

"It is a fundamental principle of copyright law that a
copyright does not protect an idea, but only the expression of
the idea."  Altai, 982 F.2d at 703 (citing Baker v. Selden, 101
U.S. 99 (1879)); see also, e.g., Rubin v. Boston Magazine Co.,
645 F.2d 80, 81 (1st Cir. 1981).  Maddog therefore cannot base
its infringement claim on the fact that IMX, like FastFreight,
also serves to maximize the efficiency of a trucking company.
Maddog must show that IMX serves this idea in the same original
way that FastFreight does.  See, e.g., Johnson, 409 F.3d at 19
("copyright law protects original expressions of ideas but it
does not safeguard either the ideas themselves or banal

21

expressions of them").  To make this showing, in turn, Maddog
must necessarily identify this "original way," i.e., how
FastFreight's design maximizes the efficiency of a trucking
company.  By locating the level in a program's structure where
its animating idea crystallizes into the expression of that idea,
the abstraction step of the Altai test provides the generally
accepted method of identifying this "original way."  4 Nimmer,
supra, § 13.03[F][1], at 13–122.

Thus, without any evidence or argument from Maddog directed
at the abstraction step of the Altai test, the court cannot
discern what is original about the "design, selection and
arrangement" of FastFreight's elements so as to fall within the
scope of the program's copyright protection.  It follows that the
court cannot determine whether Sklader infringed on that
protection when he created IMX.  Because Maddog bears the burden
of demonstrating that Sklader has copied something original to
FastFreight in order to succeed on its copyright claim, Maddog's
failure to address this point is fatal to its motion for a
preliminary injunction insofar as the motion is premised on that
claim.[8]  See Liberty Am. Ins. Group, Inc. v. Westpoint

---

[8]After locating the expression within FastFreight's
structure, the court would proceed to Altai's filtration step,
removing expression merged with the program's ideas, necessarily
incidental to those ideas, or taken from the public domain to

22

Underwriters, L.L.C.. 199 F. Supp. 2d 1271, 1290 (M.D. Fla. 2002)
(denying motion for preliminary injunction on copyright claim
where "Plaintiffs failed to present a meaningful analysis of the
protectability of its [*sic*] source code" for their allegedly
infringed software).

        In its brief, Maddog appears to disavow any claim that any
of FastFreight's constituent parts, e.g., its "screens,
directories, macros and other data," qualify as original elements
in and of themselves, arguing instead that the program's
originality inheres in the "design, selection and arrangement" of
these elements.  Mem. Supp. Mot. Prelim. Inj. at 11–13.  Metcalf,
however, opined that "a huge percentage" of IMX was "identical"
to FastFreight based on his observation that the programs share
the same queries, macros, modules, and reports, and that the
screens comprising the user interface in each program are
"identical pixel for pixel."  In the interest of completeness,
then, the court will analyze Metcalf's theory that IMX bears an
actionable degree of similarity to FastFreight based on Sklader's
inclusion of these elements of FastFreight in IMX.

---

arrive at a core of protectable expression, if any.  982 F.2d at
706.  Maddog has also failed to offer any evidence or meaningful
argument directed at the filtration step.  See Mem. Supp. Mot.
Prelim. Inj. at 11.  This additional failure also prevents the
court from finding that Maddog has a likelihood of success on the
merits of its infringement claim.

Again, to prevail on an infringement claim based on the presence of elements of FastFreight in IMX, Maddog must show that those elements are original to FastFreight.  <u>Feist</u>, 499 U.S. at 361.  Maddog suggests that generating FastFreight's forms and corresponding elements required Sklader to make choices from among options offered by the Microsoft Access Wizard and thereby renders those elements or their underlying source code original.[9]  Sklader, however, argues that these aspects of the program are not original to FastFreight, but came from existing third-party programs or publicly available material, or are otherwise devoid of originality because they were dictated by external forces such as accepted programming methods or the business practices of the intermodal trucking industry.

As previously discussed, material taken from the public domain or other third-party sources does not become "original" through its incorporation in a copyrighted work, because "copyright . . . has no effect one way or the other on the copyright or public domain status of the preexisting material."

_____

[9]The court refers to FastFreight's queries, macros, modules, and reports as "corresponding elements" to the program's forms based on its understanding that these elements proceed from the information entered on the forms.  <u>See</u> note 3 <u>supra</u> and accompanying text.  Indeed, Metcalf described FastFreight as "a series of forms which can be called in any order."

Feist, 499 U.S. at 359 (internal quotation marks omitted; ellipse in original).  Sklader testified that he obtained many of FastFreight's forms from a database distributed with Microsoft Access and some of FastFreight's source code from materials publicly available within the programming community.  Rather than questioning this account of FastFreight's creation, Maddog takes the position that those materials now fall within the scope of its copyright because they are "part of FastFreight, which is a copyrighted product," as McKenna asserted at the injunction hearing.  As Feist and its progeny make clear, this reflects a profound misunderstanding of the law of copyright.  See, e.g., 4 Nimmer, supra, § 13.02[B][2][b], at 13-72.  Neither Sklader nor anybody else can be held liable for infringement simply for using elements of FastFreight that were unoriginal to that program in the first instance.

Sklader also testified that some of FastFreight's forms reflect mathematical formulae that cannot be expressed any other way.  Under the copyright law merger doctrine, the ideas behind those formulae therefore merge with their expression in the forms in question, rendering any such forms unprotectable.  See, e.g., Concrete Mach., 843 F.2d at 606.  Moreover, the evidence received at the injunction hearing also demonstrated that the standard practices of the intermodal trucking industry largely dictated

the categories of information which each form includes.[10]  As
Nimmer has noted, "[s]imilarities arising from such factors
should play no role in determining whether the structure and
organization of two programs are substantially similar."
4 Nimmer, supra, § 13.03[F][3][d], at 13-137 (footnote omitted).
Thus, to the extent FastFreight's forms simply reflect standard
industry practices, they do not represent expression original to
the program.  See Plains Cotton Coop. Ass'n of Lubbock, Tex. v.
Goodpasture Computer Serv., Inc., 807 F.2d 1256, 1262 & n.4 (5th
Cir. 1987) (affirming denial of injunction against claimed
infringement of cotton trading program where defendants' version
"designed to present the same information as is contained on a
cotton recap sheet," standard in cotton trading business).

It also follows from the doctrine of merger that, even
though a program could have expressed an underlying idea through
a number of different ways in the theoretical sense, "efficiency
concerns can make one or two choices so compelling as to
virtually eliminate any other form of expression" as a practical
matter.  4 Nimmer, supra, § 13.03[F][2], at 13-126 (footnote
omitted).  "In such cases, the merger doctrine should be applied
to deny protection to those elements of a program dictated purely

---

[10]This point was confirmed by the testimony of MMF's vice
president.

26

by efficiency concerns."  Id. at 13-127 (footnote omitted); see also Altai, 982 F.2d at 708-709.

Accordingly, the fact that Sklader chose from among some number of programming options in creating FastFreight does not make the results of his choices protectible unless the options he eschewed also would have made sense as a practical matter.  See Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 536 (6th Cir. 2004) ("In order to characterize a choice between alleged programming alternatives as expressive . . . the alternatives must be feasible within real-world constraints.") Although Metcalf testified that Sklader could have made choices in creating IMX to make it "fundamentally different" from FastFreight, he offered no opinion as to the feasibility of those choices.[11]  Metcalf's testimony therefore does not support the theory that Sklader copied protected elements of FastFreight in putting together IMX.  See id. at 539-40; see also Baystate Techs., Inc. v. Bentley Sys., Inc., 946 F. Supp. 1079, 1089 (D. Mass. 1996).

---

[11]Indeed, Metcalf identified only one such choice:  writing IMX outside of Microsoft Access.  Even if the court could infer from this testimony that FastFreight could have been written outside of Access, Metcalf did not say whether doing so would have been practical.  Given the apparently widespread use of Access among Maddog's clients, writing FastFreight to work with a different database strikes the court as an unrealistic option. See 4 Nimmer, supra, § 13.03[F][3][d], at 13-133 (noting that designing program to meet "technical requirements of the end user" does not amount to expressive choice).

Finally, the "pixel for pixel" similarity between the
FastFreight and IMX screen displays does not support any theory
of infringement even hinted at by Maddog.  Because screen
displays "represent products of computer programs, rather than
the programs themselves," such displays enjoy copyright
protection only as audiovisual works independent from the
programs which generate them.  Altai, 982 F.2d at 703; see also
4 Nimmer, supra, § 13.03[F], at 13–106 n.282.  Maddog premises
its infringement claim entirely on its characterization of
FastFreight as a computer program.  Mem. Supp. Mot. Prelim. Inj.
at 5.  Any similarity between the screen displays is therefore
immaterial to Maddog's claim that Sklader has infringed its
copyright in FastFreight.  See ILOG, 181 F. Supp. 2d at 14;
4 Nimmer, supra, § 13.03[F], at 13–106 n.282.

To be sure, the record developed at the motion hearing
leaves some doubt as to whether every single choice Sklader made
in designing FastFreight's forms and the like proceeded from
external factors so as to imbue those elements with no
protectable expression whatsoever.  But Maddog must do more than
offer a laundry list of the elements of FastFreight which Sklader
has incorporated into IMX to demonstrate actionable copying.
Maddog has the burden to show that these elements constitute
protectable expression with reference to the various doctrines

28

just discussed.  Because Maddog has not even attempted to make such a showing, it has failed to demonstrate a likelihood of success on its infringement claim to the extent it arises out of Sklader's copying any of the constituent elements of FastFreight. The court therefore does not reach Sklader's argument that his distribution of IMX was authorized by 17 U.S.C. § 117(a)(1).

II.  <u>Maddog's Covenant Not To Compete Claim</u>

Maddog also seeks injunctive relief on the basis of the non-competition provision of its employment agreement with Sklader. Under that provision, "upon termination of [Sklader's] employment for any reason, he will not directly engage in the same line of business, now carried on by Maddog Software, for a period of three years and within the territory of New England, New York, New Jersey, and Pennsylvania."  Sklader argues, <u>inter alia</u>, that the geographic and temporal scope of this restriction exceed what is necessary to protect Maddog's legitimate interests and that, in any event, the restriction has already expired.

The court will address the latter point first.  Although Maddog acknowledges that the non-competition provision lapsed at least three months ago in accordance with its terms,[12] the

_____

[12]Consistent with McKenna's testimony, Maddog argues that Sklader was terminated effective April 30, 2002, and that the

company argues that Sklader's "continued and acknowledged violation of [the provision] during the last three years warrants the exercise of this court's equitable jurisdiction to enjoin the illegal competition for one year from the date of this Court's Order" on the motion for preliminary injunction.  Mem. Supp. Mot. Prelim. Inj. at 22.  Maddog provides no authority or argument in support of this proposition, which strikes the court as dubious.

If Sklader did in fact violate the covenant not to compete while it was still in effect, Maddog has an adequate remedy for that breach at law in the form of damages for whatever losses the company can prove that it has suffered as a result.  Contrary to Maddog's assertion, damages would therefore fully redress it for the loss of its "bargained for respite" and prevent Sklader from enjoying any "reward . . . for his breach."  Id.  In contrast, extending the term of the non-competition provision for an arbitrary period stretching well beyond what the parties bargained for would put Maddog in a considerably better position, and Sklader in a considerably worse one, than the parties put themselves in when they signed the contract.  Even if the court had the equitable discretion to enlarge a party's contractual

---

non-competition provision therefore would have expired on April 30, 2005.  Although Sklader's recollection appears to differ on this point, the factual dispute does not affect the court's resolution of this issue for purposes of the present motion.

obligations as a penalty for its breach in this way, the court would decline to exercise its discretion to that effect here.[13] Maddog cannot obtain prospective relief to enforce an expired non-competition agreement.

Furthermore, Maddog has also failed to demonstrate a likelihood of success on the merits of its claim arising out of the agreement.  Because New Hampshire law looks with disfavor on non-competition agreements, they are enforceable only if the restraint is reasonable under the particular circumstances of the case.  E.g., Merrimack Valley Wood Prods., Inc. v. Near, ___ N.H. ___, 2005 WL 1074295, at *3 (N.H. May 9, 2005).  Among other requirements, "[a] restraint on competition must be narrowly tailored in both geography and duration to protect [the employer's] legitimate interest in its goodwill" to be reasonable.  Concord Orthopaedics Prof'l Ass'n v. Forbes, 142 N.H. 440, 444 (1997); see also Technical Aid Corp. v. Allen, 134 N.H. 1, 10 (1991).  Maddog acknowledges that the non-competition

---

[13]Maddog's claim that it did not become aware of Sklader's alleged breach "until the latter part of 2003" does not support its argument for injunctive relief on the basis of the non-competition provision and, in fact, undercuts it.  Had Maddog acted expeditiously in seeking injunctive relief at that point, it might have been able to hold Sklader to the agreement for the remainder of its term.  Instead, Maddog waited more than a year to try to enforce the provision.  Maddog cannot now expect salvation from its own unexplained delay through an extraordinary exercise of equitable jurisdiction.

provision "is different [i.e., broader] in scope and longer in duration than that which would be found enforceable by the New Hampshire Supreme Court today."  Mem. Supp. Mot. Prelim. Inj. at 20.  Maddog nevertheless urges the court to reform the provision to prohibit Sklader from "soliciting sales from any customer of [Maddog] that [he] learned about while working for [Maddog]." Id. at 20.

Under New Hampshire law, "[c]ourts have the power to reform overly broad restrictive covenants if the employer shows that it acted in good faith in the execution of the employment contract." Merrimack Valley, 2005 WL 1074295, at *5; see also Technical Aid, 134 N.H. at 17.  Rather than shouldering its burden to make this showing, Maddog simply asserts that "there is no evidence that [it] acted in bad faith" in executing the non-competition agreement.  Mem. Supp. Mot. Prelim. Inj. at 20.  But the absence of proof of bad faith does not equal proof of good faith for purposes of this inquiry.  Rather, the court "must examine all the relevant circumstances of a particular case."  Merrimack Valley, 2005 WL 1074295, at *6.

Here, McKenna has offered no explanation whatsoever for restricting Sklader from competing in a geographic area encompassing the entire northeastern section of the country despite the fact that Maddog never had any customers in any of

32

those states, save Pennsylvania and New Jersey.  McKenna also failed to explain any legitimate business reason for restricting Sklader from competing for a period of three years following his termination.  Instead, in response to questioning from Sklader on these subjects at the motion hearing, he stated, "Your livelihood is of no concern of mine whatsoever."

The court finds that Maddog has failed to show that it acted in good faith in executing the non-competition provision at issue here.  Cf. Ferrofludics Corp. v. Advanced Vacuum Components, Inc., 968 F.2d 1463, 1471 (1st Cir. 1992) (suggesting that good faith could support reformation of overly broad noncompetition provision under New Hampshire law where "terms are merely marginally overbearing so as to suggest that the employer simply miscalculated the extent of the restrictions required for its reasonable protection").  The court therefore declines to exercise its equitable power to reform the provision, which Maddog acknowledges is unenforceable as written.  Accordingly, Maddog has no likelihood of success on the merits of its claim arising out of the employment agreement.

## Conclusion

For the foregoing reasons, the court concludes that Maddog has failed to demonstrate a likelihood of success on the merits

33

of either its copyright or covenant not to compete claim.
"Because likelihood of success is a sine qua non to preliminary
injunctive relief," Air Line Pilots Ass'n, Int'l v. Guilford
Transp. Indus., 399 F.3d 89, 105 (1st Cir. 2005), Maddog's motion
for a preliminary injunction (document no. 10) is DENIED.

    SO ORDERED.


                                           _____
                                           Joseph A. DiClerico, Jr.
                                           United States District Judge

August 9, 2005

cc:  Daniel P. Schwarz, Esquire
     Michael A. Sklader, pro se

34